**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOYETTE WEBB**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**MAVIS TIRE SUPPLY LLC** d/b/a **MAVIS DISCOUNT TIRE**,<br><br>Defendant. | Case No. 7:25-cv-8615<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Joyette Webb ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Mavis Tire Supply LLC d/b/a Mavis Discount Tire ("Defendant"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action arises out of the recent data breach caused by Defendant's failure to adequately secure and safeguard the highly-sensitive personally identifiable information ("PII" or "Private Information") of its current and former customers and employees, including Plaintiff and Class Members.

2. Defendant is one of the largest independent multi-brand tire retailers in the United States, offering vehicle maintenance services and a wide range of automotive products for sale.[1]

[1] *Our Story*, MAVIS TIRE (2025), https://www.mavis.com/about-us/ (last accessed Oct. 16, 2025).

3. Plaintiff and Class Members were required to provide their sensitive, non-public Private Information to Defendant as a condition of purchasing goods and services and/or obtaining employment, without which Defendant could not perform its regular business activities.

4. By soliciting, collecting, using, storing, and deriving a benefit from the Private Information it required Plaintiff and Class Members to provide, Defendant assumed legal and equitable duties to protect and safeguard that information from unauthorized access.

5. Defendant owed a non-delegable duty to Plaintiff and Class Members to implement and maintain reasonable and adequate data security measures to secure, protect, and safeguard their Private Information. Defendant claims to "take reasonable precautions to maintain the protection of the [Private Information] [it] collect[s] . . . including through the use of physical, electronic and procedural measures."[2] Contrary to those promises, however, Defendant negligently and/or recklessly maintained Plaintiff's and Class Members' Private Information on inadequately secured systems, leaving Plaintiff's and Class Members' highly-sensitive data vulnerable to cyberattacks.

6. On or around September 23, 2025, an unauthorized third party gained access to Defendant's inadequately secured systems and obtained files containing Plaintiff's and Class Members' Private Information (the "Data Breach").[3]

7. Upon information and belief, the following types of Private Information were compromised and stolen in the Data Breach: names, dates of birth, Social Security numbers, license plate numbers, Vehicle Identification Numbers ("VIN"), addresses, and contact information.

---

[2] *Privacy Policy*, MAVIS TIRE (Feb. 4, 2025), https://www.mavis.com/privacy-policy/.
[3] *Ransomware Group worldleaks Hits: Mavis Tire Supply*, HOOKPHISH (Sept. 23, 2025), https://www.hookphish.com/blog/ransomware-group-worldleaks-hits-mavis-tire-supply.

8. Upon information and belief, the notorious ransomware group Worldleaks has claimed responsibility for the Data Breach.[4] "Unlike traditional ransomware, which encrypts and steals data, Worldleaks focuses exclusively on exfiltration and the threat of publication."[5] Worldleaks also operates an extortion-as-a-service (EaaS) platform, providing its criminal affiliates with tools to automatically exfiltrate sensitive consumer data.[6]

9. To date, Defendant has yet to issue any public disclosure about the Data Breach.

10. Defendant failed to implement and maintain reasonable and industry standard data security practices to adequately protect Plaintiff's and Class Members' Private Information, — including by, *inter alia*, failing to encrypt or redact the highly sensitive Private Information it solicited, collected, and stored. Plaintiff's and Class Members' unencrypted, unredacted Private Information was compromised and stolen in the Data Breach due to Defendant's negligent and/or careless acts and omissions, and their Private Information is now in the hands of cybercriminals.

11. Cybercriminals target the types of Private Information stolen in the Data Breach because it is a valuable commodity to identity thieves.

12. Armed with the Private Information accessed and stolen in the Data Breach, cybercriminals can commit many different forms of fraud, including: identity theft, financial and government benefit fraud, and using the stolen information to create highly believable and personalized phishing attempts to steal more data from victims.

---

[4] *Id.*

[5] *Worldleaks: between pure extortion and traditional ransomware, what's the difference?*, SOS RANSOMWARE (Aug. 20, 2025), https://sosransomware.com/en/ransomware-groups/worldleaks-between-pure-extortion-and-traditional-ransomware-whats-the-difference/.

[6] *See Worldleaks: between pure extortion and traditional ransomware, what's the difference?*, SOS RANSOMWARE (Aug. 20, 2025), https://sosransomware.com/en/ransomware-groups/worldleaks-between-pure-extortion-and-traditional-ransomware-whats-the-difference/; *Worldleaks*, RANSOMLOOK, https://www.ransomlook.io/group/worldleaks (last accessed Oct. 16, 2025).

13. In addition to actual and attempted misuse of their stolen Private Information, Plaintiff and Class Members will now face an imminent and continuing risk of future identity theft and fraud for the rest of their respective lifetimes. That risk is heightened by the theft of Social Security numbers, a class of PII that is particularly valuable to identity thieves, and compounded by Defendant's failure to timely notify victims of the Data Breach.

14. Plaintiff brings this action on behalf of all persons whose Private Information was compromised and stolen in the Data Breach, as a result of Defendant's failure to: (i) implement reasonable and industry standard data security practices to adequately protect the Private Information it solicited and collected from Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of its inadequate data security practices; and (iii) provide timely and adequate notice of the Data Breach.

15. Plaintiff and Class Members have already suffered, and will continue to suffer, injury as a result of Defendant's misconduct, including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

16. Plaintiff seeks to remedy these harms and prevent any future compromise of her Private Information, on behalf of herself and all similarly situated persons whose Private Information was compromised and stolen in the Data Breach, which remains at risk due to Defendant's inadequate data security practices.

**PARTIES**

17. Plaintiff is a natural resident and citizen of Jefferson County, Alabama.

18. Defendant is a Delaware limited liability company, headquartered in New York and maintaining a principal place of business at 358 Saw Mill River Road, Millwood, Westchester County, New York, 10546.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C.§ 1332(d)(2), because Plaintiff and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, Defendant regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

21. Venue is proper under 28 U.S.C. § 1391(a)(2), (b)(1)-(3), and (c)(2) because Defendant's principal place of business is located in this District, Defendant conducts substantial business in this District, and a substantial part of the events giving rise to the claims emanated from activities within this District.

## FACTUAL ALLEGATIONS

***Defendant's Business***

22. Defendant is one of the largest independent multi-brand tire dealers in the United States, offering a large selection of tires, wheels and auto parts for sale, and a variety of vehicle maintenance services, including tire installation, oil change and brake services, flat tire repair, state car inspections, and wheel alignment.[7]

23. Plaintiff and Class Members are current and former customers and/or employees of Defendant.

24. In order to purchase products and services from Defendant, and/or as a condition of employment with Defendant, Plaintiff and Class Members were required to provide Defendant with their sensitive and confidential Private Information.

25. In the ordinary course of its business, Defendant collects and maintains the Private Information of its current and former customers and employees, including but not limited to:

- Social Security numbers;
- contact information, including names, postal addresses, email addresses, and telephone numbers;
- demographic information, such as age, date of birth, and gender;
- driver's license numbers and/or state ID card numbers;
- vehicle information, including Vehicle Identification Numbers, license plate numbers and issuing jurisdictions, vehicle make and model, and service history;
- geolocation data;

[7] *Mavis Tire*, https://www.mavis.com/ (last accessed Oct. 16, 2025).

- financial information, including payment card numbers, expiration dates, authorization numbers, security codes, and billing addresses; and
- records of products or services purchased, obtained, or considered.[8]

26. At the time of the Data Breach, the information stored and maintained on Defendant's inadequately secured computer systems included the unencrypted Private Information of Plaintiff and Class Members.

27. Defendant made promises and representations to Plaintiff and Class Members, that the Private Information it solicited and collected from them would be kept safe and confidential, that the privacy of their information would be maintained, and that Defendant would "take reasonable precautions . . . including . . . physical, electronic and procedural measures" to protect Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.[9]

28. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep their information confidential and secure from unauthorized access.

29. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use their information for necessary purposes only, and to make only authorized disclosures of their information. Plaintiff and Class Members value the confidentiality of their Private Information and reasonably expected Defendant to implement and

---

[8] *See Privacy Policy – Personal Information We Collect*, MAVIS TIRE (Feb. 4, 2025), https://www.mavis.com/privacy-policy/.

[9] *See, e.g.*, *Privacy Policy*, MAVIS TIRE (Feb. 4, 2025), https://www.mavis.com/privacy-policy/; *Mavis Tire Puts The Brakes on Ransomware Attacks*, SONICWALL (2018), https://www.sonicwall.com/resources/case-studies/mavis-tire-puts-the-brakes-on-ransomware-attacks.

maintain adequate data security measures to safeguard their Private Information from unauthorized access.

30. Defendant had a duty to adopt reasonable data security measures to protect and secure the Private Information it solicited and collected from Plaintiff and Class Members. Defendant had, and continues to have, a legal duty to keep Plaintiff and Class Members' Private Information safe and confidential.

31. Defendant's data security obligations arise from common law, contract, industry standards, representations made to Plaintiff and Class Members, and federal and state statutory law, including the Federal Trade Commission Act (the "FTC Act").

32. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information, without which Defendant could not render its services Plaintiff and Class Members.

33. By soliciting, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

***The Data Breach***

34. On or around September 23, 2025, an unauthorized third party gained access to Defendant's inadequately secured systems and exfiltrated Plaintiff's and Class Members' unencrypted Private Information.[10]

---

[10] *Ransomware Group worldleaks Hits: Mavis Tire Supply*, HOOKPHISH (Sept. 23, 2025), https://www.hookphish.com/blog/ransomware-group-worldleaks-hits-mavis-tire-supply.

35. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: names, dates of birth, Social Security numbers, license plate numbers, VINs, addresses, and other contact information.

36. Upon information and belief, the notorious cybercriminal group Worldleaks has claimed responsibility for the Data Breach.[11]

37. To date, Defendant has yet to issue any public disclosure about the Data Breach.

38. Despite its duties and promises to safeguard the Private Information it solicits, collects, and maintains, Defendant failed to follow industry standard practices to protect and secure Plaintiff's and Class Members' highly-sensitive data.

39. Defendant failed to implement reasonable data security procedures and practices appropriate to the nature of the highly sensitive information it solicited and collected from Plaintiff and Class Members, such as encrypting the information or deleting it when no longer needed.

40. As a result, cybercriminals targeted, accessed, and exfiltrated files containing the unencrypted Private Information of Plaintiff and Class Members from Defendant's inadequately secured computer systems.

41. Upon information and belief, Plaintiff's and Class Member's Private Information was posted for sale on the Dark Web following the Data Breach, as that is the *modus operandi* of Worldleaks, the cybercriminals who perpetrated the Data Breach.[12]

---

[11] *Id.*

[12] *See, e.g.*, *See Worldleaks: between pure extortion and traditional ransomware, what's the difference?*, SOS RANSOMWARE (Aug. 20, 2025), https://sosransomware.com/en/ransomware-groups/worldleaks-between-pure-extortion-and-traditional-ransomware-whats-the-difference/; *Worldleaks*, RANSOMLOOK, https://www.ransomlook.io/group/worldleaks (last accessed Oct. 16, 2025).

***Data Breaches Are Preventable***

42. Defendant could have prevented the Data Breach by, among other things, properly encrypting or otherwise protecting the Private Information stored on its systems.

43. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[13]

44. To prevent and detect cyberattacks, Defendant could and should have taken the following measures, as recommended by the United States Government:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read

---

[13] *How to Protect Your Networks from RANSOMWARE*, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Oct. 16, 2025).

specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[14]

45. To prevent and detect cyberattacks or ransomware attacks, Defendant could and should have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
  - Remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

[14] *Id.* at 3-4.

- **Include IT Professionals in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

- **Build credential hygiene**
    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**
    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications][15]

46. Because Defendant was storing Plaintiff's and Class Members' highly sensitive Private Information, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

47. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures, resulting in the unauthorized access and exfiltration of Plaintiff's and Class Members' Private Information in the Data Breach.

---

[15] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

***Defendant Solicits, Collects, and Stores Plaintiff's and Class Members' Private Information***

48. As a condition of obtaining services and products from Defendant, Plaintiff and Class Members were required to provide their sensitive and confidential Private Information to Defendant.

49. Defendant retains and stores the Private Information of its current and former customers and employees, and it derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendant would be unable to provide its services and products.

50. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

51. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and secure, to use their information for business purposes only, and to make only authorized disclosures of that information.

52. Defendant could have prevented the Data Breach by implementing and maintaining industry standard data security measures, including properly encrypting the files and file servers containing Plaintiff's and Class Members' Private Information.

***Defendant Knew or Should Have Known the Risk of a Data Breach***

53. Data thieves regularly target companies like Defendant due to the highly sensitive information they collect store. Defendant knew and understood that the Private Information stolen in the Data Breach is valuable to criminals who seek to illegally monetize sensitive consumer data.

54. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches targeting entities, like Defendant, that collect and store Private Information.

55. The estimated number of organizations impacted by data compromises has increased by 2,600 percentage points since 2018, and the estimated number of victims has increased by 1400 percentage points.[16] In 2023, reported data compromises reached an all-time high, with 3,205 compromises affecting 353,027,892 total victims.[17] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high (1,860) set in 2021.[18]

56. In light of recent high profile data breaches at other industry-leading companies—including T-Mobile, USA (37 million records, February - March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023)—Defendant knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

57. Additionally, as companies became more dependent on computer systems to run their business,[19] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of

---

[16] *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[17] *Id.*

[18] *Id.*

[19] Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, FEDS NOTES (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

Things, the danger posed by cybercriminals is magnified, highlighting the need for adequate administrative, physical, and technical safeguards.[20]

58. As a custodian of Private Information, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members. Defendant knew or should have known that its data security practices were inadequate and likely to result in the unauthorized access and/or theft of Plaintiff's and Class Members' Private Information, and the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

59. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from unauthorized access and disclosure.

60. Defendant was, or should have been, fully aware of the sensitivity and volume of Private Information stored on its systems, and the significant number of individuals who would be harmed by the exposure of their unencrypted data.

61. Nevertheless, Defendant failed to implement adequate data security measures to prevent the Data Breach.

62. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and maintain adequate data security measures to protect and secure the Private Information of Plaintiff and Class Members.

[20] Suleyman Ozarslan, *Financial Services and Banking Firms in 2022*, PICUS (March 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

63. The ramifications of Defendant's failure to protect and secure Plaintiff's and Class Members' Private Information are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

***Defendant Failed to Comply with FTC Guidelines***

64. The FTC has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

65. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. These guidelines note that businesses should: protect the Private Information they collect and maintain, including by encrypting sensitive information stored on computer networks; properly dispose of Private Information that is no longer needed; understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

66. The guidelines also recommend that businesses: use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

67. The FTC further recommends that companies: not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

---

[21] *Protecting Personal Information: A Guide for Business*, FTC (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[22] *Id.*

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

68. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69. These FTC enforcement actions include actions against companies like Defendant.[23]

70. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, like Defendant, of failing to use reasonable measures to protect Private Information.

71. Defendant's failure to implement and maintain reasonable and appropriate data security measures to protect Plaintiff's and Class Members' Private Information, and its failure to

[23] *See, e.g.*, *In re Lookout Servs., Inc.*, 151 F.T.C. 532, 535 (June 15, 2011) (the defendant "allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as by employing an intrusion detection system and monitoring system logs"); *In re DSW, Inc.*, 2006 WL 6679055, at *2 (FTC Mar. 7, 2006) (the defendant "failed to employ sufficient measures to detect unauthorized access"); *In re TJX Cos., Inc.*, 2008 WL 3150421, at *2, (FTC Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks"); *In re Dave & Buster's Inc.*, No. C-4291 (FTC May 20, 2010) (the defendant "failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between in-store networks").

comply with applicable industry standards, constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72. At all relevant times, Defendant was or should have been fully aware of its obligations to protect Plaintiff's and Class Members' Private Information. Defendant also knew or should have known that its data security practices were inadequate and likely to result in the unauthorized access and/or theft of Private Information. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it solicited and collected from Plaintiff and Class Members, and the foreseeable consequences and damages that Plaintiff and Class Members have already suffered, and will continue to suffer, in the wake of the Data Breach.

***Defendant Failed to Comply with Industry Standards***

73. Cybersecurity experts routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

74. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendant, including but not limited to: requiring strong passwords; implementing multi-layer security, including firewalls, anti-virus, and anti-malware software; encrypting sensitive data; requiring multi-factor authentication; and limiting access to sensitive data.

75. Other industry standard cybersecurity practices include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting physical security systems; and training all employees and staff

76. Defendant failed to follow these industry best practices, including failing to encrypt the Private Information stored on its systems.

77. Upon information and belief, Defendant failed to meet the minimum standards of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04); and the Center for Internet Security's Critical Security Controls (CIS CSC).

78. These frameworks are established industry standards for safeguarding Private Information, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

***The Value of Personally Identifying Information***

79. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employee-benefit management company or taxpayer identification number."[25]

[24] 17 C.F.R. § 248.201 (2013).
[25] *Id.*

80. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour explained: "Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[26]

81. Upon information and belief, the unencrypted Private Information stolen in the Data Breach has already been posted for sale on the Dark Web, as that is the *modus operandi* of Worldleaks, the perpetrators of the Data Breach.[27]

82. Private Information is highly valuable to criminals, as evidenced by the prices they will pay for it on the Dark Web. Numerous sources cite Dark Web pricing for stolen Private Information.[28] For example, Private Information can be sold at a price ranging from $40 to $200.[29] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[30]

---

[26] *Commissioner Pamela Jones Harbour, Remarks Before FTC Exploring Privacy Roundtable*, FTC (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[27] *See, e.g.*, *Worldleaks: between pure extortion and traditional ransomware, what's the difference?*, SOS RANSOMWARE (Aug. 20, 2025), https://sosransomware.com/en/ransomware-groups/worldleaks-between-pure-extortion-and-traditional-ransomware-whats-the-difference/; *Worldleaks*, RANSOMLOOK, https://www.ransomlook.io/group/worldleaks (last accessed Oct. 16, 2025).

[28] *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[29] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[30] *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

83. The Private Information stolen in the Data Breach—including Social Security numbers, and license plate numbers—is especially valuable to cybercriminals because it is difficult, if not impossible, to replace and/or change.

84. The type of data stolen in the Data Breach is sold at a premium on the Dark Web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[31]

85. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the data by selling the stolen information on the Dark Web to other criminals who then utilize the information to commit a variety of identity theft related crimes.

86. Due to the highly sensitive nature of Social Security numbers—which, upon information and belief were compromised in the Data Breach—theft of Social Security numbers in combination with other PII (*e.g.*, name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Tom Stickley, a data security researcher who is employed by companies to find flaws in their information technology systems, stated: "If I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings."[32]

87. License plate numbers—which, upon information and belief were compromised in the Data Breach— can be used to commit a variety of crimes, including government benefits and

---

[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[32] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capitalone-equifax-data-breach-social-security/.

financial fraud. License plate numbers can also be used to develop sophisticated phishing scams designed to steal additional information.

88. Stolen license plate numbers can also provide information that criminals can use to target, impersonate, or track victims.[33] A license plate number, standing alone, can be used to trace a vehicle's movements on public databases, or by exploiting the car's GPS.[34] In 2022, flaws in a popular GPS tracker could have enabled criminals to remotely track, stope, and even take control of vehicles.[35]

89. Criminals may also use a stolen license plate number to impersonate victims. License plate cloning is a type of identity theft where a license plate is duplicated and put on another vehicle, usually the same make and model. This allows the identity thief to avoid detection, and the victim may wrongly receive any resulting fines or violations. "Criminals clone license plates to avoid paying tolls, parking fees, and traffic fines. [ . . . ]. Clone plates also help bad actors to conceal more serious crimes. Stolen cars, drug transport, or getaway vehicles may carry fake plates to avoid detection and delay investigations."[36] And "[b]ecause license plate recognition

---

[33] Sophia Kaufman, *What Can Someone Do With Your License Plate Number?*, Aura (Jan. 16, 2024), https://www.aura.com/learn/what-can-someone-do-with-your-license-plate-number#:~:text=Fraudsters%20can't%20find%20out,%2C%20impersonate%2C%20or%20track%20you.

[34] *Id.*

[35] *Id.*; *see also* Danny Palmer, *Flaws in a popular GPS tracker could allow hackers to track or stop vehicles, say security researchers*, ZDNET (July 20, 2022), https://www.zdnet.com/article/flaws-in-a-popular-gps-tracker-could-allow-hackers-to-track-or-stop-vehicles-say-security-researchers/ ("Security researchers warn that vulnerabilities could have 'disastrous consequences.'").

[36] Emily Lockwood, *License plate cloning could lead to paying fines that aren't yours*, LifeLock (July 7, 2025), https://lifelock.norton.com/learn/fraud/license-plate-cloning?srsltid=AfmBOop7oqYYEEXA_178KXMvgBfjBogfQ2Ac19Ry8QTH6xhSTuU--PuH.

systems rely on accurate registration data, cloning helps criminals blend in and operate without drawing attention."[37]

90. According to experts, one out of four data breach notification recipients become a victim of identity fraud.[38]

91. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[39]

92. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

93. In addition to the emotional toll identity theft can take, and out-of-pocket expenses which can exceed thousands of dollars, many data breach victims have to spend considerable time repairing the damage caused by the theft of their Private Information.

94. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity fraud needed more than a month to resolve issues stemming from identity theft.[40]

---

[37] *Id.*

[38] *See Anne Saita, Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, THREATPOST (Feb. 21, 2013), *https://web.archive.org/web/20240420164617/https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.*

[39] Louis DeNicola, *What Can Identity Thieves Do With Your Personal Info and How Can You Protect Yourself?*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/askexperian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-youprotect-yourself/.

[40] *2023 Consumer Impact Report*, IDENTITY THEFT RESOURCE CENTER (Aug. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact Report_Final-1.pdf.

Victims of financial fraud will have to spend time correcting fraudulent information in their credit reports, continuously monitor their reports for future inaccuracies, close existing bank and credit accounts, open new ones, and dispute charges with creditors.

95. The unencrypted Private Information stolen in the Data Breach may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the consent of Plaintiff and Class Members.

96. Another way cybercriminals profit from stolen Private Information is by compiling "Fullz" packages, or dossiers on individuals.[41]

97. With "Fullz" packages, cybercriminals can cross-reference two or more sources of Private Information to marry stolen data with unregulated data available elsewhere, with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

98. The development of "Fullz" packages means that the Private Information stolen in the Data Breach can be used to link and identify it to data from unregulated sources. In other words, even if certain information such as emails, phone numbers, or credit card numbers are not be

---

[41] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, their name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information stolen from a victim, the more money that can be made off that data. Fullz packages are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the Dark Web. Fullz can be cashed out (turning credentials into money) in various ways, including by performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sept. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

included in the Private Information that was exfiltrated in the Data Breach, criminals may still create Fullz packages and sell them at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers), over and over again.

99. The fraudulent activity resulting from the Data Breach may not come to light for years. There is often a time lag between when Private Information is stolen and when it is misused, and also between when harm occurs and when it is discovered. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[42]

100. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized use of their stolen Private Information for years or even decades to come.

101. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records. Plaintiff and Class Members have already incurred, and will continue to incur, significant damages associated with mitigating the impact of the Data Breach.

***Common Injuries and Damages***

102. The Data Breach is a direct and foreseeable result of Defendant's ineffective and inadequate data security practices.

103. Plaintiff and Class Members have already suffered, and will continue to suffer, damages as a result of Defendant's misconduct, including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information

[42] *Report to Congressional Requesters*, GAO (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. Plaintiff and Class Members have a continuing interest in ensuring their Private Information remains safe, and they are therefore entitled to injunctive and other equitable relief.

***Mitigation Expenses***

104. When a data breach occurs, the reasonable person is expected to take steps to protect themselves and mitigate the risk of identity theft and fraud.

105. Here, the Data Breach was a targeted attack, carried out by sophisticated and well known cybercriminals. Given the sensitive nature of the Private Information stolen in the Data Breach, there is a high likelihood that the data has already been posted for sale on the Dark Web, where it can be purchased by criminals intending to misuse the Private Information for a variety of identity theft crimes—including, but not limited to, opening bank accounts in the victims' names to make fraudulent purchases or launder money; filing false tax returns; taking out loans or lines of credit; and filing false unemployment claims.

106. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employee-benefit

management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

107. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

108. Plaintiff and Class Members have already spent, and will continue to spend additional time, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time, which cannot be recaptured.

109. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

110. Plaintiff's and Class Members' mitigation efforts are consistent with recommendations contained in a 2007 GAO Report, which noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43]

111. Plaintiff's and Class Member's mitigation efforts are also consistent with FTC recommendations that data breach victims take steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (an extended fraud alert that lasts for seven years if someone steals their identity), reviewing

---

[43] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/new.items/d07737.pdf.

their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[44]

***Diminution of Value of Private Information***

112. Private Information is a valuable property right and has considerable market value.[45] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cybercrimes, which include heavy prison sentences.

113. Private Information can sell for as much as $363 per record, according to the Infosec Institute.[46]

114. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[47] The data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48]

115. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic

---

[44] *See* FTC, Identity Theft.gov, https://www.identitytheft.gov/Steps.
[45] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report").
[46] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[47] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[48] *See, e.g.*, David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers; *The personal data revolution*, https://datacoup.com/ (last accessed Oct. 17, 2025).

loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

116. At all relevant times, Defendant knew or reasonably should have known the importance of safeguarding the Private Information it required Plaintiff and Class Members to provide, and the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

117. The fraudulent activity resulting from the Data Breach may not come to light for years. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records.

118. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and maintain adequate data security practices to protect the Private Information of Plaintiff and Class Members.

***Loss of Benefit of the Bargain***

119. Defendant's failure to implement and maintain adequate data security practices deprived Plaintiff and Class Members of the benefit of their bargain.

120. Plaintiff and Class Members made purchases of products and services from Defendant, and provided their Private Information to Defendant, with the reasonable expectation and mutual understanding that Defendant would properly safeguard and protect their data. But Defendant failed to provide the expected data security. Similarly, when agreeing to employment services from Defendant, current and former employee Class Members understood part of the wages withheld from them, went to data protection services, Accordingly, Plaintiff and Class

Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

***Plaintiff's Experience***

121. Plaintiff Webb is a customer of Defendant.

122. In order to purchase products and obtain services from Defendant, Plaintiff was required to provide her Private Information to Defendant.

123. Upon information and belief, Plaintiff's Private Information was stored by Defendant on an inadequately secured system at the time of the Data Breach.

124. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

125. Plaintiff provided her Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would use reasonable measures to protect her data, in accordance with state and federal law and the data security promises posted on Defendant's public-facing website.

126. Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on mitigation activities in response to the Data Breach—valuable time Plaintiff would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

127. Following the Data Breach, Plaintiff suffered substantial damages including, but not limited to: (i) invasion of her privacy; (ii) theft of her Private Information; (iii) lost time and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (iv) lost or diminished value of her Private Information; (v) nominal damages; and (vi) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect her Private Information.

128. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant still has not provided any notice of or information about the Data Breach.

129. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

130. As a result of the Data Breach, Plaintiff faces a present and imminent risk of future identity theft and fraud, that will continue for years to come.

131. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future compromise.

## CLASS ACTION ALLEGATIONS

132. Plaintiff brings this nationwide class action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

133. The Class that Plaintiff seeks to represent is defined as follows**:**

> **Nationwide Class**: All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").

134. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

135. Plaintiff reserves the right to amend the definitions of the Class or add a Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

136. The proposed Class meets the criteria for certification under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

137. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not impossible. Although the precise number of individuals is currently unknown to Plaintiff, and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted by the Data Breach. The Class is identifiable within Defendant's records, and upon information and belief, Defendant has already identified those individuals.

138. <u>Commonality</u>. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class, which predominate over questions which may affect individual Class members, include the following:

a. Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had a duty not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had a duty to not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. When Defendant learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised in the Data Breach;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised in the Data Breach;

h. Whether Defendant failed to implement and maintain reasonable data security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and

k. Whether Plaintiff and Class Members are entitled to injunctive or other equitable relief to redress the imminent and ongoing risk of future fraud and identity theft.

139. Typicality. Plaintiff's claims are typical of the claims of other Class Members, because, *inter alia*, Plaintiff and all Class Members were similarly injured as a result of Defendant's uniform misconduct as described herein, and were victims of the same alleged Data Breach.

140. Policies Generally Applicable to the Class. This class action is appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies, as challenged herein, apply to and affect all Class Members uniformly and Plaintiff's claims hinge on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

141. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of Class Members because her interests do not conflict with the interests of the Class she seeks to represent. Plaintiff seeks no relief that is antagonistic or adverse to other Class Members. Plaintiff has retained counsel that is experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

142. Superiority and Manageability. Class litigation is an appropriate method for fair and efficient adjudication of this controversy. Class action treatment is superior to all other available methods because it will permit a large number of Class Members to prosecute their

common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will also permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation, like Defendant. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

143. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged herein. Defendant would necessarily gain an unconscionable advantage, because: it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the rights of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

144. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

145. Adequate notice can be given to Class Members directly, using information maintained in Defendant's records.

146. Unless a Class-wide injunction is issued, Defendant may: continue in its failure to properly secure and protect the Private Information of Plaintiff and Class Members; continue to refuse to provide proper notification to Class Members regarding the Data Breach; and continue to act unlawfully as set forth in this Complaint.

147. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

148. Likewise, particular issues under Federal Rule of Civil Procedure 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify Plaintiff and the Class of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's data security measures were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to implement and maintain adequate data security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard Plaintiff and Class Members' Private Information; and

f. Whether adherence to FTC data security recommendations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

149. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 131, as if fully set forth herein.

150. Defendant required Plaintiff and Class Members to provide non-public Private Information in the ordinary course of its business.

151. Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its regular course of business.

152. Plaintiff and Class Members entrusted Defendant with their Private Information with the reasonable expectation and mutual understanding that Defendant would safeguard their information from unauthorized access and disclosure.

153. Defendant knew or should have known the types of harm that Plaintiff and Class Members could and would suffer if their highly sensitive Private Information was accessed and/or stolen by unauthorized third parties.

154. Defendant owes a duty under common law to Plaintiff and Class Members to exercise reasonable care in safeguarding, securing, and protecting the highly sensitive and confidential Private Information it solicits, collects, stores, and maintains.

155. Defendant owes a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, and other standards discussed herein, to ensure that its

systems and networks, and the personnel responsible for them, are adequately secure to protect the Private Information Defendant solicits, collects, stores, and maintains.

156. Defendant has a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including—as interpreted and enforced by the FTC—the unfair practice of failing to use reasonable measures to protect confidential data.

157. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that exists between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and Class Members entrusted Defendant with their confidential Private Information, as a condition of obtaining services, products, and/or employment from Defendant.

158. Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' confidential Private Information arose not only as a result of the statutes and regulations described herein, but also because Defendant is bound by industry standards to protect confidential Private Information.

159. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

160. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Plaintiff's and Class Members' Private Information once it was no longer required to retain the data pursuant to regulations.

161. Defendant also had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

162. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and Class Members might have been compromised, how it was compromised, and the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and/or fraudulent use of their Private Information.

163. Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and was therefore negligent, when it failed to implement and maintain reasonable data security measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiff's Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

d. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised;

e. Failing to remove Plaintiff's and Class Members' Private Information once it was no longer required to retain it pursuant to regulations, and

f. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach, so they could take appropriate steps to mitigate the consequences of the Data Breach and the ongoing risk of future fraud and identity theft.

164. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Member's Private Information and comply with applicable industry

standards, as described herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it solicited, collected, and stored, and the foreseeable consequences that would result to Plaintiff and the Class in the event its systems were breached.

165. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

166. Plaintiff and Class Members are within the class of persons the FTC Act is intended to protect, and the type of harm that resulted from the Data Breach is the type of harm the statute was intended to guard against.

167. The FTC has pursued enforcement actions for unfair and deceptive practices against businesses, like Defendant, who fail to employ reasonable data security measures.

168. The Data Breach, and the resulting injury to Plaintiff and the Class, were reasonably foreseeable, particularly in light of Defendant's inadequate data security practices.

169. It was foreseeable that Defendant's failure to use reasonable measures to secure and protect Plaintiff's and Class Members' Private Information would result in harm to Plaintiff and Class Members. The Data Breach was also foreseeable, given the high frequency of cyberattacks and data breaches targeting companies, like Defendant, in possession of Private Information.

170. Defendant has full knowledge of the sensitivity of the Private Information it solicits, collects, and stores, and the types of harm that Plaintiff and the Class could and would suffer if their Private Information were wrongfully disclosed.

171. Plaintiff and the Class were the foreseeable and probable victims of Defendant's inadequate data security practices and procedures. Defendant knew or should have known the inherent risks of collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate data security to protect that Private Information from

unauthorized access and disclosure, including the necessity of encrypting Private Information stored on its systems.

172. It was therefore foreseeable that Defendant's failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members.

173. Plaintiff and the Class had no ability to protect their Private Information that was in, and upon information and belief, remains in Defendant's possession.

174. Defendant was in the best position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

175. Defendant's duty extends to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

176. But for Defendant's wrongful and negligent breach of the duties it owed to Plaintiff and the Class, the Private Information of Plaintiff and Class Members would not have been compromised and stolen in the Data Breach.

177. There is a close causal connection between Defendant's failure to implement adequate data security measures to protect the Private Information of Plaintiff and the Class, and the harm, and imminent risk of future harm, suffered by Plaintiff and the Class. The unauthorized access and theft of Plaintiff's and Class Members' Private Information in the Data Breach was the

proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate data security measures.

178. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have already suffered, and will continue to suffer, damages including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

179. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have already suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to: anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

180. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

181. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have already suffered and will continue to suffer from the ongoing and imminent risk of future exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to

undertake appropriate and adequate measures to protect the Private Information in its continued possession.

182. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

183. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and/or identity theft protection to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

184. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 131, as if fully set forth herein.

185. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable data security measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

186. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Member's Private Information, in compliance with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it solicited, collected, and stored, and the foreseeable consequences of a data breach.

187. Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se.*

188. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) are intended to protect.

189. The harm suffered by Plaintiff and Class Members as a result of the Data Breach is the type of harm the FTC Act (and similar state statutes) are intended to guard against. The FTC has pursued over fifty enforcement actions against businesses, like Defendant, who fail to employ reasonable data security measures and avoid unfair and deceptive practices, causing the same harm suffered by Plaintiff and Class Members.

190. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have already suffered, and will continue to suffer, damages including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

191. Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

192. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 131, as if fully set forth herein.

193. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information and payment and/or labor. In exchange, Plaintiff and Class Members had a reasonably expected and mutual understanding that Defendant would implement and maintain adequate data security practices to secure their Private Information.

194. Defendant knew that Plaintiff and Class Members conferred a benefit upon it, and it accepted and retained that benefit by accepting payment and/or labor and the Private Information entrusted to it. Defendant profited from Plaintiff's payment and/or labor and used Plaintiff's and Class Members' Private Information for business purposes.

195. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, it did not fully compensate Plaintiff or Class Members for the value their Private Information, payments, and/or labor provided.

196. Defendant solicited and obtained Plaintiff's and Class Members' Private Information through inequitable means, because it failed to investigate and/or disclose the inadequate data security practices previously alleged.

197. If Plaintiff and Class Members had known that Defendant did not employ adequate data security practices to protect and secure their Private Information, they would not have purchased products and services from, provided labor to, or entrusted their Private Information to Defendant.

198. Plaintiff and Class Members have no adequate remedy at law.

199. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits, at the expense of Plaintiff and Class Members, by utilizing cheaper, ineffective data security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

200. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

201. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have already suffered, and will continue to suffer, damages including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

202. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by

establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

203. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

204. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 131, as if fully set forth herein.

205. Plaintiff and the Class entrusted their Private Information to Defendant as a condition of purchasing products and obtaining services and/or employment from Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant, pursuant to which Defendant agreed to safeguard and protect Plaintiff's and Class Members' Private Information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached, compromised, or stolen.

206. At the time Defendant acquired the Private Information of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the Private Information and not take unjustified risks when storing the Private Information.

207. Implicit in the agreements between Plaintiff and Class Members and Defendant was Defendant's obligation to: (a) use Plaintiff and Class Members' Private Information for business purposes only; (b) take reasonable steps to safeguard their Private Information; (c) prevent unauthorized access and disclosure of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft

of their Private Information; and (e) retain the Private Information only under conditions that kept such information secure and confidential.

208. Plaintiff and the Class would not have entrusted their Private Information to Defendant had they known that Defendant would not encrypt sensitive data elements, or delete the Private Information that Defendant no longer had a reasonable need to maintain.

209. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

210. Defendant breached the implied contracts they made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that their Private Information had been compromised and stolen in the Data Breach.

211. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have already suffered, and will continue to suffer, damages including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

212. Plaintiff and the Class have suffered (and will continue to suffer): an ongoing and imminent threat of future identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual and attempted identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of their stolen Private Information; the illegal sale of the compromised data on the Dark Web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, lost work time; and other economic and non-economic harm.

213. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all Class Members, requests judgment against Defendant and requests that the Court grant the following:

A. An order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosure of the Data Breach to Plaintiff and Class Members;

C. Injunctive relief, including but not limited to: injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members,

including but not limited to an Order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business, in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members, unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any

new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes, at minimum, annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personally identifiable information of Plaintiff and Class Members;

xii. requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to train internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personally identifiable information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and

assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats they face as a result of the unauthorized access and theft of their confidential Private Information in the Data Breach, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. An award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. An award of attorneys' fees and costs as allowed by law;

F. Prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims so triable.

Dated: October 17, 2025

Respectfully Submitted,

*/s/ Steven M. Nathan*
Steven M. Nathan (NY 2156289)
Ashley Crooks (NY 5800776)*
**HAUSFELD LLP**
33 Whitehall Street
14th Floor
New York, New York 10004
Tel.: (646) 357-1100
Email: snathan@hausfeld.com
Email: acrooks@hausfeld.com

James J. Pizzirusso*
**HAUSFELD LLP**
1200 17th Street, N.W.
Suite 600
Washington, DC 20036
Tel.: (202) 540-7200
Email: jpizzirusso@hausfeld.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street
Suite 2100
Chicago, IL 60606
Tel.: 866.252.0878
Email: gklinger@milberg.com

Mark K. Svensson (Bar No. 5974290)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
Tel.: (202) 975-0468
Email: msvensson@milberg.com

***Pro hac vice forthcoming****

***Attorneys for Plaintiff and Proposed Class Members***